## CIRCUIT COURT OF THE CITY OF ROANOKE

Sanders

v.

Patrick County-Stuart Chamber of Commerce, Inc.
and Appalachian Power Co.

December 14, 1982

By JUDGE JACK B. COULTER

In overruling the motions of the defendants to set aside the verdict of the jury in this case it might be of some benefit to articulate the major reasons that have influenced the Court in this decision. The novelty of some of the issues involved and the further pursuit being contemplated for their final resolution justify a more formal exposition by the trial court of the rationale of its reasoning.

There are basically three significant points of merit advanced by the defendants that warrant serious consideration. As urged by the defendants, they may be summarized as follows:

(1) There was no evidence to justify allowing the case to go to the jury in the first place. Stated differently, the plaintiff failed to make out a _prima facie_ case.

(2) Instruction No. 6 was an incorrect statement of the law. Even so, accepting it as the law of the

case, there was no evidence that the landowner (Appalachian) knew or should have known that its tenant (Patrick County-Stuart Chamber of Commerce) would admit persons to its festival before putting the land in safe condition, the second element of the duties imposed upon by a landowner by that instruction.

(3) The plaintiff, by her own testimony, established the "fact" that no "ordinary inspection" would have disclosed the hole into which she stepped and that, therefore, the defendants were not negligent in failing to discover the hole.

Taking these points one by one, Was there sufficient evidence to go to the jury? Did the plaintiff make out a prima facie case? We must bear in mind at the outset the circumstances and surroundings which gave rise to this claim. The plaintiff, along with hundreds of others, had been expressly invited to come upon the subject premises to view and examine, to wander, compare, and bargain for hundreds of articles. It was an arts and crafts festival with scores of booths and tables set up enticing interested spectators to come around. No one under such circumstances could reasonably expect upon visiting premises so arranged and designed that there would be a large and dangerous hole by which the unsuspecting might be trapped with such devastating and crippling injury. This pit, it must be emphasized, was no golfer's divot; it was twelve to eighteen inches in diameter and one to three feet deep. It had probably housed a water meter in the days when these lots, now vacant, served residential homes. This cavity in the ground was literally a land mine, a bear trap, and no one, be they owner or four-day tenant, should have undertaken so ambitious a public project as an arts and crafts festival knowing full well that multitudes of people would be trampling over every square inch of ground, without first satisfying themselves that there were no unreasonable hazards for their walking and unwary guests. They are bound to have realized that the attention of these hundreds of people would be directed and diverted to the arts and crafts they were being specifically invited and encouraged to view.

It is against this setting that the plaintiff must bear her burden of proof, complicated somewhat by the fact that the hole had been removed long before she was physically able to undertake any subsequent investigation of the scene herself. Proof by the greater weight of the evidence is, of course, the standard a plaintiff must meet; but this does not of itself relieve a defendant under certain circumstances from going forward with evidence, particularly when such evidence is peculiarly within its power to produce or conceal.

The uncontroverted facts in this case, stated from the viewpoint of the plaintiff, are that a large and dangerous hole, probably the remains of an abandoned water meter opening, was on the subject premises; that an arts and crafts show for the public was being sponsored which would attract hundreds of people; that the plaintiff as one of those so attracted came upon the premises to view and  inspect the numerous wares being exhibited; that as the plaintiff was leaving she stepped into the subject hole, which was hidden ᶠrom normal view by a ground covering of undisclosed dimension; and that as a result she fell and sustained almost unbelievable injuries to her leg and ankle resulting in fifteen to twenty fractures to the bones of her ankle and leg, ultimately requiring five operations and leaving her a partial cripple.

From these facts it is the Court's view, as it was the plaintiff's argument, that certain inferences could be legimately drawn, so long as reasonable and not beyond speculation and conjecture. In addition, the concept of evidence, at least in civil cases, embraces any admissions that a party might have made, either express or implied. Express admissions, in other words, such as might have been made in pleadings or opening statements, and admissions by conduct such as silence, are part of the portfolio of evidence by which the threshold of a <u>prima</u> <u>facie</u> case can be crossed.

The fact that there was a ground cavity of such magnitude as the one that trapped Mrs. Sanders gives rise to certain reasonable inferences. The landowner knew of the hole or it did not. If the landowner did not know, it should have. If it knew of the hole, it should have notified its tenant, which it either did or did not do. On the other hand, the tenant knew of the hole or it did not. If it did not, it should have. If it did, it should have taken adequate steps to cover it or warn against it. Such are the inferences, it is submitted, that reasonable minds could draw from the facts adduced--<u>rebuttable</u> inferences, it is to be emphasized, which additional facts or explanations submitted by the defendants could have tempered or offset.

These are basic elements of the plaintiff's case, but when not established by positive, direct and affirmative evidence, are they not subject to legitimate and reasonable inferences which would transfer to the defendants the burden, not of ultimate persuasion, but of going forward with some evidence of explanation or rebuttal?

In addition to inferences, however, certain facts which the defendants claim the plaintiff did not prove had been admitted either in the defendants' opening statements or in their pleadings. Mr. Rakes, for instance, on behalf of Appalachian, admitted:

1. That Appalachian had owned the subject property since "around 1970" (Tr. # 2-15);

2. That Appalachian had been in the habit "of having a Mr. Ralph Turner to go over the property with a bushhogger (Tr. # 2-15) "two or three times a year" (Tr. # 2-16); and

3. That Appalachian officials or employees "knew more about that property than anybody else in the world" (Tr. # 2-17) and <u>they did not know the hole was there</u> (Tr. # 2-18).

These admissions were consistent with Appalachian's Grounds of Defense in which it was admitted that the hole was "previously unknown to this defendant" (paragraph 5) and that "it had inspected the premises prior to the time they were leased to the codefendant, Patrick County-Stuart Chamber of Commerce, and that despite all reasonable precautions, the above latent defect was not discovered" (paragraph 7).

Mr. Hutton, on behalf of the Chamber of Commerce, promised in his opening statement:

> The evidence will be that Ms. Cogar (the Chamber's representative) and Mr. Sears (Appalachian's official) visited this site. They went around the site.

> The Power Company, I believe, has owned this property since about 1970. Some of the pitfalls and the relationship to some of the hazards on the site were highmarked and, as it were, certain Precautions made. The evidence will be from the Power Company, from the Chamber of Commerce, and I do not believe there will be any evidence from the plaintiff that anybody knew that this hole was there. (Tr. # 2-10)

Representations made by counsel in their opening statements may not, strictly speaking, constitute formal evidence, but they can become admissions. As observed in 75 Am. Jur. 2d, Trial, § 202:

> The opening statement is not a substitute for the pleadings or for material evidence showing that a cause of action or a defense exists. However, this rule does not mean that an attorney, acting as his client's agent within the scope of his authority, is not able to make admissions favorable to the opposing side . . . . (emphasis added)

See also, <u>McLhinney</u> v. <u>Landsdell Corp.</u>, 254 A.2d 177 (Md. 1969), in which the first headnote summarized:

> Where defendant's counsel, in opening statement, admitted that defendant truck driver was employed by corporate defendant, that truck was involved in accident and that corporate defendant owned truck, verdict should not have been directed for defendants on theory that plaintiff failed to establish defendant driver's involvement in accident and corporate defendant's ownership of truck, as counsel had removed such issues from matters in controversy.

In discussing this issue and the scope of opening statements, the Court, quoting from a prior authority, noted at page 180:

> They (admissions of counsel) may dispense with proof of facts for which witnesses would otherwise be called . . . . <u>Indeed, any fact, bearing upon the issues involved, admitted by counsel, may be the ground of the court's procedure, equally as if established by the clearest proof.</u> . . . (emphasis added)

There would be something intrinsically unfair in a result that would permit a party to make certain positive representations as facts in an opening statement and then attempt to take advantage of his opposition not proving what he had represented to be true or what he had promised his evidence would be.

If Appalachian and the Chamber did not know that a ground cavity of the subject dimension existed on the two relatively small, formerly residential lots--which they admitted--then, it is submitted, that the burden of going forward with some explanation shifted to them. A <u>prima</u> <u>facie</u> case had been established. It then became the defendants' responsibility to show, as was affirmatively alleged in Appalachian's Grounds of

Defense, that "precautions" to discover the defect had been taken. What were those "reasonable precautions" that Appalachian claimed it had taken?

In addition, the silence of the defendants on this issue is within the concept of an admission by conduct, the admission by silence. Neither defendant chose to put on any evidence whatever, either to deny, rebut or explain such reasonable inferences as the uncontroverted facts or their own admissions warranted. Instruction No. 2.080 at page 33 of Volume I of the relatively new Virginia Model Jury Instructions, which was not tendered nor given in this case, would appear to cover the law on this subject:

> When a party, without explanation, fails to call an available witness who has knowledge of necessary and material facts [fails to testify to necessary and material facts that he knows; fails to produce necessary and material physical evidence in his control] you may presume that, if called, that witness's [party's] testimony [physical evidence] would have been unfavorable to the party who failed to call him [failed to testify; failed to produce the evidence].

The inferences reasonably generated by the uncontroverted facts established in this case, when coupled with the express admissions made by the defendants in their opening statements and the implied admissions by silence, were sufficient in the judgment of this Court to have allowed this case to have gone to the jury. The fact that counter-inferences were not available to nor accepted by the jury because of the defendants' decision to stand mute is a risk the defendants assumed.

Instruction No. 6, which is based on the Restatement of Torts 2nd, § 359, was initially tendered by Appalachian, but subsequently withdrawn. The Court would have been unaware of this particular statement of the law had its attention not been drawn to it by the conscientious research of the party who now objects

to its having been given. Upon hindsight and after the smoke of battle has cleared, this instruction is a clumsy effort at setting forth the duties of a landowner who is leasing his land knowing it is to be used by the public. The instruction as given, however, is more favorable to Appalachian than it should have been, for it overlooks what is required of the landowner vis-a-vis its tenant when it, in fact, does not know of the hazard but, in the exercise of reasonable care, should have known about it. How can a landowner advise its tenant of a hazard it does not know about? And how could the plaintiff prove that Appalachian, the landowner, knew or should have known that its tenant, the Chamber, "would admit persons to the festival before putting the land in safe condition" IF APPALACHIAN DID NOT KNOW OF THE HAZARD? In view of the silence of the landowner, of its refusal to go forward with any explanation, such an inference, that Appalachian should have known that the Chamber would have admitted persons to the festival without removing the hazard, is inescapable if it is conceded that Appalachian did not know of the hazard in the first place.

A thorough analysis and study of the Reporter's Notes to § 359 of the Restatement demonstrates that no further consideration was given of the landlord's duties when it did not, in fact, know of the hazard. The type of inferences suggested, however, where the landlord knew of the hazard, is worthy of note. At page 247 the Reporter observed:

> The lessor may have a number of different grounds for believing that the lessee will permit persons to enter the land without so changing the conditions existing at the time of the lease as to make it safe for their entry. The land may be leased for so short a period as to make it unreasonable to expect that the lessee will make any change while using it. It may be leased for a use so immediate that the lessee has no opportunity to make the repairs or alterations necessary to make the land safe for visitors. The

known character of the lessee or his lack of financial resources necessary to make the alterations and repairs, may make it clear that the land is to be used as leased . . .

Instruction No. 6, in hindsight, could have been more clearly written, but it was more favorable to the defendant, Appalachian, than it was entitled to. Viewing all the instructions as a whole, which included directions to the effect that the defendants were not insurers of the plaintiff's safety and that the mere happening of an accident in itself did not entitle a plaintiff to recover, the clumsiness of Instruction No. 6 does not justify in the judgment of this Court setting aside the jury's verdict.

Finally, the defendants make much ado about the "admission" of the plaintiff herself that the hole was not visible to "ordinary inspection" and hence, if not so visible to an unsuspecting guest, that ergo a landowner and occupant should not be held accountable for failing to discover it. Such might--and did--make good argument before a jury, but it is a jury that should interpret and evaluate such evidence. The language, it must be remembered, was that of the attorney, who on cross-examination asked:

Q. It would not have been visible to ordinary inspection?

A. No sir.                                    (Tr. # 1-146)

But the "inspection" expected of an invitee and that required of her invitor should be subject to different standards. The "inspection" of one walking over ground which she has been invited to walk over, while talking about Christmas gifts for her little daughter (Tr. # 1-12 and 72) should be far less stringent than that of a landowner knowing it is soon to be used for a public event or of a tenant who is preparing to sponsor a highly publicized arts and crafts festival.

Furthermore, "inspection" is a word of different meaning to different people. It may have meant to the

attorney asking the question an official and painstaking examination of close and scrutinizing appraisal; while Mrs. Sanders might have understood it simply to suggest mere casual observation, the product of a trusting glance.

It should also be noted that shortly after the above exchange, beginning on the very next page (Tr. # 1-147), counsel attempted to impeach the plaintiff as to this very evidence, pointing out that she had previously testified at her discovery deposition to the effect that she had not been looking at the ground at the time she stepped into the hole. Although this out-of-court statement was not admissible as substantive evidence, it conceivably could have persuaded the jury to discount the plaintiff's in-court admission that the hole was not visible to ordinary inspection. This was counsel's obvious objective at the time in his effort to establish the contributory negligence of the plaintiff.

The interpretation and evaluation of all of the plaintiff's testimony, including this somewhat damaging, but nonfatal admission, was the proper subject for jury resolution.

Other points suggested by the plaintiffs in their very able briefs and oral arguments have been considered, but do not rise to the level of the three dealt with in this opinion and are simply found not persuasive.

Concluding then, to have taken this case away from the jury would have defeated the purpose of jury trials; to set aside its considered and composite judgment on such shallow grounds would be a miscarriage of justice. The defendants have had, if not a perfect trial, at least a fair one. The verdict of the jury should stand. For these reasons, the motions to set it aside are overruled and the final judgment order recently tendered is entered this date.